UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:09CR 58 SNLJ |
| | ) | |
| WILLIE D. HINTON, | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION

The defendant filed his Motion and Memorandum of Willie Hinton to Suppress Evidence and Statements (Document #27). The government filed Government's Response to Defendant's Motion to Suppress Evidence and Statements and Motion for True Identity of Informants (Document #28). An evidentiary hearing was held and the parties asked that a transcript be ordered. Following the receipt of the transcript, the defendant filed Supplemental Memorandum of Willie Hinton to Suppress Evidence and Statements (Document #36) to which the government filed Government's Memorandum in Opposition to Defendant's Motion to Suppress Evidence (Document #40). The defendant then filed his Reply to the Government's Memorandum in Opposition to Defendant's Motion to Suppress Evidence (Document #42). The government had asked for time to file a surreply but presumably did not feel the necessity to actually file a surreply.

In his motion to suppress, the defendant asked that all physical evidence be suppressed which was derived from the search of:

(1)      the garage of a residence at 222 West Danner, #3, West Memphis, Arkansas,

along with the vehicle located in the garage; and

(2)     the residence at 222 West Danner, #3, West Memphis, Arkansas, along with

        any statements given by defendant on March 13, 2009.

In his supplemental memorandum and in his reply, the defendant alleged:

I.      The Search Warrant And Supporting Affidavit Were Constitutionally
        Defective In That They Failed To Set Forth Sufficient Facts To Establish
        That There Is A Fair Probability That Contraband Or Evidence Of Criminal
        Activity Will Be Found In The Particular Place To Be Searched.

II.     Defendant Never Voluntarily Gave His Consent To Search His Residence In
        That Defendant Was In Custody And Was Not Given His Miranda Warnings.

## **Factual Background**

On March 12, 2009, United States Magistrate Judge H. David Young of the Eastern District

of Arkansas issued a search warrant to search the garage and Ford Taurus located at 222 W. Danner

Street, Apartment No. 3, West Memphis, Arkansas.  The DEA was able to obtain the search warrant

based on information obtained from three confidential sources in an investigation of Tracy Selvy.

Two of the sources indicated that there was a drug conspiracy between Hinton and Selvy.  All three

sources indicated that the maroon Ford Taurus had a hidden compartment or trap inside the vehicle.

Confidential Source (CS) #2 said there was a hidden compartment in the Taurus and identified a

photograph of Hinton.  CS #2 also believed that Hinton delivered illegal drugs in the hidden

compartment of the Ford Taurus.  The information from all three confidential sources corroborated

the information provided by each source.  Agent Bernie Gard of the Drug Enforcement

Administration testified that he believed sufficient facts were set forth within the affidavit to support

a probable cause finding that evidence of a crime would be found in the garage located at Hinton's

residence, as well as in the maroon Ford Taurus located in the garage.  Agent Gard's belief was based

on the information he had received from the confidential sources and because he had personally

observed the Ford Taurus in the garage at 222 W. Danner Street approximately thirty days prior to the request for the warrant. Additionally, Agent Gard had other officers check to see if the Taurus was in the garage on 222 W. Danner St., Apartment No. 3, on two other occasions. One of these occasions was on March 12, the day before the warrant was executed, and at that time, the Taurus was located in the garage. In summary, the Taurus was observed by law enforcement officers in Hinton's garage on at least three separate occasions.

The search warrant was executed on March 13, 2009. Agents Gard and Darrell Spain knocked on the door and announced "police." After 15 to 20 seconds, the officers again knocked on the door and rang the doorbell repeatedly. The officers believed someone was in the apartment because they heard rustling coming from inside the residence. The officers continued to knock and after two full minutes Agent Harness indicated to Agent Gard that a black male had looked out the blinds. At that point, Agent Gard again announced "police" and the door opened. Agent Gard identified the individual at the door as Hinton. Agent Gard was familiar with Hinton because he had seen Hinton approximately thirty days earlier in Cape Girardeau, Missouri, when Hinton appeared before a grand jury.

Agent Gard asked if they could come in and Hinton replied "sure, come in, come in." Hinton then stepped aside and the two agents entered the residence. Hinton was then told that the agents were there to serve a search warrant on the garage and asked if he would open it for them, which Hinton did. When asked if there was anyone in the residence, Hinton replied that nobody else was in the apartment. Agent Gard then asked if they could confirm that by doing a security sweep for their protection and Hinton agreed. Agent Gard stayed with Hinton and inquired about the Taurus in the garage. Hinton replied that his ex-sister-in-law owned the Taurus and that he had been storing

it for her for the last three months. Hinton had driven the vehicle as late as March 12, the day before. He also stated that he had been in sole custody of the vehicle for the last three months and that no one else had possession of the vehicle during that time period. When the officers observed the Taurus the day before the execution of the search warrant, the Taurus was backed into the garage. During the execution of the search warrant, the Taurus was parked nose first, which indicated that someone had driven it sometime between March 12 and 13.

Agent Gard also asked Hinton if there were any illegal drugs in the residence and Hinton replied that there were not. When asked if they could search the residence (i.e., the interior of the residence since there was already a search warrant for the garage), Hinton stated, "Yes, be my guest." Detective Dennis of the West Memphis Police Department handed Agent Gard a consent to search form. The three then took a couple steps over toward the kitchen table where Detective Dennis read the consent to search form to Hinton and explained it to him. Hinton appeared to understand the form as it was read and explained to him. Hinton voluntarily signed the form and Agent Gard signed as a witness. Detective Phillips was the only other officer in the immediate vicinity of the kitchen table.

The agents were in the house for approximately four minutes before they requested to search the interior of the residence. Hinton consented to the request. Hinton was not threatened by any officers, physically intimidated or punished prior to requesting consent to search. None of the officers made any promises or misrepresentations in order to get Hinton to consent to the search. Consent was given while Hinton, Agent Gard and the other officers were inside the house away from public view. Agent Gard informed Hinton that Hinton was not under arrest and the consent form advised Hinton that he could refuse to give consent for the search. Hinton was never handcuffed or physically

restrained before or after giving consent to search.  Gard testified Hinton possessed unrestrained freedom of movement when he was asked for consent to search.  During the search, Hinton smoked several cigarettes.  There were also no strong-arm tactics or deceptive strategies used to obtain consent from Hinton.

During the search of Hinton's residence, Agent Gard was wearing a tactical vest that had "police" in yellow, along with DEA badge, as well as his tactical belt with his firearm.  None of the officers drew their weapons before, during or after the search.  In Agent Gard's opinion, the atmosphere was not police dominated.  Agent Gard testified that the approach to the residence was "low key," because they didn't have a search warrant for the house (i.e. the warrant was for the garage) or an arrest warrant for Hinton.  Agent Gard described the approach as "knock, knock, we'd like to get in your garage without kicking the door, will you let us in.  So it was a little bit more low key."  There were an estimated nine total officers present either inside or outside of Hinton's apartment when the search warrant was executed.  One of the officers stayed by the garage and never entered the residence.  Another officer stayed outside the door to prevent unwanted visitors from entering and once Agent Gard started talking to Hinton, Agent Spain went to the garage.  The remaining officers were spread out through the apartment conducting the search.  Agent Gard described the traffic of officers within the residence and where Hinton was positioned as "light."

While the search was conducted, Hinton was sitting in a chair in the living room.  Hinton's movement was restricted to the living room area because the officers had found several handguns within the residence and other items of evidence were seized from the kitchen.  Agent Gard testified that if Hinton had told them he did not want to talk to them or did not want them in his house, then the officers would have seized the Taurus from the garage and left.  While the search was going on,

Agent Gard stated that Hinton was very polite and amiable. Agent Gard added that Hinton did not argue with him and never asked for the search of his residence to be stopped. Agent Gard stated that Hinton acted as "if he invited people into his home to hang out."

During the search, the officers seized six plastic freezer vacuum heat-sealable freezer bags and a digital scale with residue on it that tested positive for cocaine. There was also an empty gallon-sized ziplock bag with white residue that tested positive for cocaine. There were three handguns, a scoped rifle and some ammunition that were not seized. The maroon Ford Taurus was also seized as well as a Nissan Pathfinder floor mat. A transmission service receipt and warranty, as well as other documents bearing Tracy Selvy's name were located in the glove box and in the floorboard of the Taurus. A pill bottle with the name of Tracy Selvy was also located inside the Taurus. An electronically controlled hidden compartment was found in the Taurus. The floor mat that was seized had the identification "Pathfinder" stitched on it. A Pathfinder, in which Selvy was a passenger, was seized in December of 2008 in Southeast Missouri and that Pathfinder was missing the driver's side floor mat. The Pathfinder seized in December 2008 that was missing the floor mat had a hidden compartment containing a kilogram of heroin and 10 pounds of marijuana.

Agent Gard did not stay for the last one-third of the search because the Taurus was taken to a local service center to be searched, and Agent Gard went to the location off-site where the Taurus was examined. Before Agent Gard left to go to the service center, he was informed of all the items that had been seized. Agent Gard then told Hinton that he would like to ask him a few questions in regard to the items seized. Agent Gard advised Hinton of his <u>Miranda</u> rights and Hinton stated that he understood his rights. After Hinton was advised of his rights, he was asked if he would answer some questions, but Hinton chose to remain silent. At that point, no further questions were asked

of Hinton, and Agent Gard left Agent Spain in charge before departing. Agent Gard also told Agent

Spain to stop searching if Hinton decided to revoke his consent. At the end of the search, Hinton was

taken into custody for possession of drug paraphernalia.

## Discussion

As noted, the defendant alleges:

> I.    The Search Warrant And Supporting Affidavit Were
> Constitutionally Defective In That They Failed To Set Forth
> Sufficient Facts To Establish That There Is A Fair Probability
> That Contraband Or Evidence Of Criminal Activity Will Be
> Found In The Particular Place To Be Searched.

## Probable Cause

The United States Supreme Court has defined probable cause to search as "a fair probability

that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S.

213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is

different from the standard to be used by the judge who issues the search warrant. As the Supreme

Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, common sense
> decision whether, given all the circumstances set forth in the affidavit before him,
> including the "veracity" and "basis of knowledge" of persons supplying hearsay
> information, there is a fair probability that contraband or evidence of a crime will be
> found in a particular place. And the duty of a reviewing court is simply to ensure that
> the magistrate had a "substantial basis for ... conclud[ing]" that probable cause
> existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Court offered the following caution to reviewing courts, Id. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the
> sufficiency of an affidavit should not take the form of de novo review. A magistrate's
> "determination of probable cause should be paid great deference by reviewing courts."

Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

a fluid concept--turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v. United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavits should not take the form of a de novo review.

In reviewing the affidavit, the court finds that the affidavit does state probable cause that evidence of a crime would be found in the garage and Ford Taurus located at 222 West Danner Street, #3, West Memphis, Arkansas. A summary of the affidavit follows.

Special Agent Randy Harness of the Drug Enforcement Administration presented to United States Magistrate Judge H. David Young of the Eastern District of Arkansas an Affidavit in which

Agent Harness states that his investigation has revealed that Tracy Lee Selvy and others, including Willie Dwayne Hinton, are involved in the illegal transportation of heroin, powder cocaine, and marijuana from the West Memphis, Arkansas, area to the Cape Girardeau County, Missouri, area, as well as the distribution of said substances. The affidavit continues that the agent's investigation has revealed that a maroon-colored, 2000 Ford Taurus station wagon, bearing Vehicle Identification Number 1FAFP58UXYA224771and License Plate Number 512-KRJ, is parked in the garage at 222 West Danner Street, Apt. 3, in West Memphis, Arkansas, and that the maroon Taurus station wagon is relevant to the drug investigation. These statements are by way of an introduction to the affidavit. Agent Harness then proceeded to give, in the affidavit, facts supporting his belief, that the maroon Ford Taurus station wagon had been utilized in the trafficking of controlled substances.

On December 12, 2008, Vincent Davis and Tracy Lee Selvy were stopped by a Missouri State Highway Patrolman when they were in a white Nissan Pathfinder driven by Davis. Davis was the registered owner of the Pathfinder. Selvy was the only passenger. Davis consented to a search of the Pathfinder. Two "elaborate, non-factory installed, hidden compartments" were discovered. One compartment in the rear cargo area contained over one kilogram of heroin and ten pounds of marijuana.

The affidavit continues that within the prior two months Special Agent Bernie Gard of the Drug Enforcement Administration in Cape Girardeau, Missouri, interviewed two individuals in Cape Girardeau termed Source of Information (SOI) #1 and SOI #2. Agent Gard informed Agent Harness that both SOI #1 and SOI #2 have given information to law enforcement that Agent Gard has been able to corroborate in the past.

SOI #1 indicated to Agent Gard on multiple occasions in the last eighteen months Tracy Lee

Selvy requested that SOI #1 drive a maroon Ford Taurus from Arkansas to Cape Girardeau, Missouri. During the trip, Selvy followed SOI #1 in a separate vehicle all the way to Cape Girardeau. SOI #1 related that during each trip, once he and Selvy arrived in Cape Girardeau, SOI #1 exited the maroon Ford Taurus, Selvy got in the maroon Ford Taurus and drove away. SOI #1 reported that Selvy would return each time in approximately thirty minutes or less. SOI #1 stated that Selvy paid him/her in exchange for driving the maroon Taurus to and from Cape Girardeau. SOI #1 added that during one of the trips, Selvy told SOI #1 to be careful driving because the vehicle contained illegal drugs in the hidden compartment within the maroon Taurus.

SOI #2 indicated that he was familiar with Tracy Lee Selvy. SOI #2 indicated that for an extended period of time within the last three years, he/she received packages of cocaine powder from Selvy approximately three times a week. The weight of the packages range between two and four kilograms. Packages of cocaine powder were in the form of one-kilogram "bricks." SOI #2 indicated that he/she observed Selvy driving a maroon Taurus station wagon on multiple occasions in the Cape Girardeau, Missouri, area. SOI #2 thought the vehicle was owned by Selvy. On one occasion, SOI #2 had been riding with Selvy in the maroon Taurus station wagon in Cape Girardeau. At one point, Selvy went to the rear of the maroon Taurus. When SOI #2 approached Selvy, who was at the rear of the vehicle, Selvy was in possession of a quantity of illegal drugs. SOI #2 did not see a hidden compartment; however, he/she indicated that the back of the Taurus station wagon was littered with lots of clothing and SOI #2 believed the illegal drugs had been retrieved from somewhere in the back of the vehicle.

SOI #2 further stated that Selvy encouraged him/her to locate an older vehicle so that a hidden compartment could be installed in the vehicle. SOI #2 stated that Selvy told SOI #2 that Selvy

had contacts to build hidden compartments for vehicles and that it would cost approximately $6,500.00 for installation. SOI #2 indicated that Selvy told him/her that a Nissan Pathfinder is a good vehicle for that purpose and that sport utility vehicles liked Nissan Pathfinders do not draw the attention of law enforcement. SOI #2 indicated one of the men who assisted Selvy in delivering illicit substances was nicknamed "Diddy." SOI #2 reported that he/she believed "Diddy" was from the Memphis area. Agent Harness showed SOI #2 a driver's license photograph of Willie Dwayne Hinton, and SOI #2 identified the male in the photograph as "Diddy." A public records check indicated that Willie Dwayne Hinton resides at 222 West Danner Street in West Memphis, Arkansas.

The affidavit continues that prior to receiving information from SOI #2, Agent Gard's investigation of Tracy Lee Selvy revealed that Willie Dwayne Hinton drives a truck owned by a registered trucking company called "Selvy Trucking." That company is owned by Tracy Lee Selvy. On February 4, 2009, Agent Gard and Cape Girardeau Police Officer Seger traveled to 222 West Danner Street, Apartment #3, West Memphis, Arkansas, in an attempt to contact Willie Dwayne Hinton for the purpose of an interview. Gard and Seger were unable to locate Hinton. However, Agent Gard observed a maroon-colored Taurus station wagon in the garage attached to 222 West Danner Street, Apartment #3, West Memphis. Agent Gard also was aware that Hinton was in Cape Girardeau, Missouri, on February 12, 2009, driving a green Buick 4-door sedan, the license plate for which was traced to and registered in the name of Keyiarra Latease Moore, who Gard believed, was Tracy Selvy's stepdaughter.

Agent Gard was informed by DEA Senior Special Agent Larry Gregory that Gregory took notes during an interview of an individual a little over one year ago. That individual termed SOI #3 in the affidavit indicated that he was familiar with a male known to him as Dwayne who had the

nicknames, "Puck," "Pecan," and "P-Diddy." SOI #3 believed Dwayne was from Earle, Arkansas. Agent Harness stated that he knows that Earle, Arkansas, is located near West Memphis, Arkansas. SOI #3 stated that Dwayne had a commercial driver's license and drove for "Silly," a known nickname for Tracy Lee Selvy. SOI #3 added that Dwayne sometimes drove a burgundy-colored station wagon which was outfitted with a hidden compartment. SOI #3 stated that the hidden compartment could hold up to fifteen "bricks." SOI #3 stated that for a while it seemed like Dwayne came to the Southeast Missouri area two times per month on behalf of Selvy.

The affidavit continues that on or about February 11, 2009, Lieutenant Langston of the West Memphis, Arkansas, Police Department reported to Agent Gard that the maroon Taurus station wagon was still in the garage attached to 222 West Danner Street, Apartment #3, West Memphis, Arkansas. The Taurus station wagon displayed Arkansas license plate number 512-KRJ. A check with the Arkansas Department of Revenue revealed that the vehicle is a 2000 Ford Taurus station wagon bearing Vehicle Identification Number 1FAFP58UXYA224771. The affidavit continues that the current registered owner of the maroon 2000 Ford Taurus station wagon is Lashanda Oringe who lives in Earle, Arkansas, according to the records of the Arkansas Department of Revenue.

On the evening of March 11, 2009, Lieutenant Langston confirmed that the maroon Taurus station wagon was still parked in the garage attached to 222 West Danner Street, Apartment #3, West Memphis, Arkansas.

Agent Harness had been advised by a DEA St. Louis Division expert that the cost to install hidden compartments similar to the hidden compartments found in the Pathfinder registered to Davis would have cost approximately $4,000.00 per compartment, depending on the design, placement and method of access to the trap. Agent Harness stated that it was his opinion, based on his training and

experience that drug traffickers have been known to pay substantial amounts of money to install hidden compartments within vehicles that are utilized to transport illicit drugs and money, that $6,500.00 for the installation of an elaborate hidden compartment in a 2000 Ford Taurus station wagon is a reasonable fee.

The affidavit concludes that Agent Harness believes that a non-factory installed hidden compartment and other items of evidence listed on attached Exhibit B incorporated into the affidavit by reference are present within the garage attached to 222 West Danner Street in West Memphis, Arkansas.

The court finds the following facts support the issuance of a search warrant by Magistrate Judge H. David Young.

On December 12, 2008, Tracy Lee Selvy and Vincent Davis were stopped driving a white Nissan Pathfinder. Davis was the registered owner of the Pathfinder and he consented to a search of the Pathfinder. A drug-detecting canine alerted to the presence of illegal narcotics at the front passenger side door. A search of the vehicle resulted in the discovery of two elaborate non-factory installed hidden compartments. One compartment in the rear cargo area contained one kilogram of heroin and approximately ten pounds of marijuana. The foregoing information supports the fact that both Selvy and Davis were transporting illegal narcotics, including heroin and marijuana, in an elaborate non-factory installed hidden compartment. Further, the stop indicates that Selvy and Davis are familiar with hidden compartments useful for the transportation of illegal drugs.

Both SOI #1 and SOI #2 have provided information to law enforcement in the past that Special Agent Bernie Gard has been able to corroborate. SOI #1 indicated on multiple occasions within the prior eighteen months Selvy requested SOI #1 drive a maroon Ford Taurus from Arkansas

to Cape Girardeau, Missouri. SOI #1 has credibility because he has placed himself in jeopardy from criminal activity and has subjected himself/herself to prosecution. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075 (1971); McCreary v. Sigler, 406 F.2d 1964, 1969 (8th Cir. 1969). Again, the information is credible from SOI #1 because it is based upon the personal observation of the informant. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329 (1959) (An informant who alleges he is a "eye witness" to an actual crime perpetrated demonstrates sufficient reliability "of the person.").

SOI #2 was familiar with Tracy Lee Selvy. SOI #2 indicated that for an extended period of time within the prior three years, he/she received packages of cocaine powder from Selvy approximately three times per week, and the weight of the packages ranged from two to four kilograms. Again, SOI #2 is credible because SOI #2 is admitting taking part in numerous criminal drug trafficking activities, thus, subjecting himself/herself to prosecution. Harris; McCreary v. Sigler. In addition, SOI #2, having taken part in the drug trafficking, is an eye witness. Draper. SOI #2 recalled one occasion when he/she had been riding with Selvy in the maroon Taurus station wagon in Cape Girardeau, Missouri. The affidavit continued that on that occasion Selvy was at the rear of the maroon Taurus, and when SOI #2 approached Selvy, Selvy was in possession of a quantity of illegal drugs, and SOI #2 believed the illegal drugs had been retrieved from somewhere in the back of the vehicle. The clear inference from SOI #2's experience is that the illegal drugs were being kept in the back of the Taurus station wagon, which corroborates what SOI #1 told Agent Gard that Selvy told him/her to be careful driving the maroon Taurus because the vehicle contained illegal drugs in a hidden compartment within the maroon Taurus. Selvy's apparent practice of carrying illegal drugs in the hidden compartment in the back of the maroon Ford Taurus station wagon is supported by SOI

#1's relating Selvy's practice of requesting that SOI #1 drive the Ford Taurus from Arkansas to Cape Girardeau, Missouri. During the trips, Selvy followed SOI #1 in a separate vehicle all the way to Cape Girardeau. SOI #1 related further that once he/she and Selvy arrived in Cape Girardeau, SOI #1 exited the Taurus, and Selvy got in the maroon Taurus and drove away. Selvy then returned each time in approximately thirty minutes or else. SOI #1 was paid for driving the maroon Taurus to and from Cape Girardeau. It was during one of the trips that Selvy told SOI #1 to be careful driving because the vehicle contained illegal drugs in a hidden compartment within the maroon Taurus. The actions of Selvy in distancing himself from the Taurus and the Taurus being driven by SOI #1 were obviously in order for Selvy to avoid being arrested if the Taurus was stopped and searched. Again, they substantiate what was clearly demonstrated in the stop on December 12, 2008, of Vincent Davis and Tracy Lee Selvy in the Pathfinder. It was searched, and the two elaborate non-factory installed hidden compartments were discovered with one compartment in the rear cargo area containing over a kilogram of heroin and approximately ten pounds of marijuana.

Additional information about Selvy's familiarity with hidden compartments was provided in the affidavit by SOI #2, telling Agent Harness that Selvy encouraged him/her to locate an older vehicle so that a hidden compartment could be installed in the vehicle. Selvy told SOI #2 that he, Selvy, had contacts to build hidden compartments for vehicles and that it would cost approximately $6,500.00 for installation. Selvy also told SOI #2 that a Nissan Pathfinder is a good vehicle for that purpose and that sport utility vehicles like a Nissan Pathfinder do not draw the attention of law enforcement. SOI #2 also indicated that one of the men who assisted Selvy in delivering illicit substances was nicknamed "Diddy." SOI #2 stated that he/she believed Diddy was from the Memphis area and, when shown a driver's license photograph of Willie Dwayne Hinton, identified the male in

the photograph as "Diddy." As the affidavit states, a public records check indicated that Willie Dwayne Hinton resides at 222 West Danner Street in West Memphis, Arkansas.

Prior to receiving information from SOI #2, Special Agent Gard's investigation of Tracy Lee Selvy revealed that Willie Dwayne Hinton drives a truck owned by a registered trucking company called "Selvy Trucking." That company is owned by Tracy Lee Selvy. On February 4, 2009, Agent Gard and Cape Girardeau Police Officer Seger traveled to 222 West Danner Street, Apartment #3, West Memphis, Arkansas, in an attempt to contact Willie Dwayne Hinton for the purpose of an interview. Gard and Seger were unable to locate Hinton; however, Gard observed a maroon-colored Taurus station wagon in the garage attached to 222 West Danner Street, Apartment #3, West Memphis. Gard also was aware that Hinton was in Cape Girardeau on February 12, 2009, and that the vehicle he drove to Cape Girardeau was registered to a person believed to be Tracy Lee Selvy's stepdaughter, indicating a further link between Defendant Hinton and Tracy Lee Selvy.

The affidavit continues that Special Agent Gard was informed by DEA Senior Special Agent Larry Gregory that Gregory took notes during an interview of an individual a little over one year ago now identified as SOI #3. SOI #3 indicated that he/she was familiar with a man known to him/her as Dwayne, who also had nicknames of "Puck," "Pecan," and "P-Diddy." SOI #3 believed Dwayne was from Earle, Arkansas. Agent Harness indicated in the affidavit that Earle, Arkansas, is located near West Memphis, Arkansas. SOI #3 stated that Dwayne had a commercial driver's license and drove for "Silly," a known nickname for Tracy Lee Selvy. SOI #3 added that Dwayne sometimes drove a burgundy-colored station wagon, which was outfitted with a hidden compartment. SOI #3 stated that the hidden compartment could hold up to fifteen "bricks." Agent Gregory understood that the term "bricks" is slang for a one-kilogram-size bundle of controlled substances. SOI #3 stated that

for a while it seemed like Dwayne came to the Southeast Missouri area two times per month on behalf of Selvy. "Observations of fellow officers of the government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 746, 747 (1965). Information observed by Agent Larry Gregory would fall within the observations referred to in Ventresca. The reliability of Gregory, however, is not the question. The question does concern SOI #3 and his/her reliability. The information supplied concerning Dwayne's nickname as "P-Diddy" and the fact that he was from Earle, Arkansas, which is near West Memphis, Arkansas, was the same information as was supplied earlier by SOI #1 and SOI #2. The fact that Dwayne drove for "Silly" reflects information provided by SOI #2. SOI #3's reference to Dwayne's sometimes driving a burgundy-colored station wagon, which was outfitted with a hidden compartment, comports with what SOI #1 related that Selvy had told SOI #1 about the illegal drugs in a hidden compartment within the maroon Taurus. SOI #3 stated that the hidden compartment could hold up to fifteen "bricks" of controlled substances, which would appear to be based upon personal observation. Draper. The only information which was not reported by other Sources of Information was SOI #3's statement that it seemed like Dwayne came to the Southeast Missouri area two times per month on behalf of Selvy. Because of SOI#3's other information in conformity with that of SOI #1 and SOI #2 credence and reliability attach to SOI #3's statement about the frequency of Dwayne's coming to Southeast Missouri on behalf of Selvy.

The location of the maroon Ford Taurus station wagon at 222 West Danner Street, Apartment #3, in West Memphis was corroborated on February 11, 2009, when Lieutenant Langston of the West Memphis, Arkansas, Police Department reported to Special Agent Gard that the Taurus was still in the garage attached to the defendant's address of 222 West Danner Street, Apartment #3, in West

Memphis. Previously, after SOI #2 had identified a driver's license photograph of Willie Dwayne Hinton as "Diddy," a public records check indicated that Willie Dwayne Hinton resided at 222 West Danner Street in West Memphis. The visits by Special Agent Gard and Officer Seger on February 4, 2009, as well as the visits of Lieutenant Langston on February 11, 2009, and March 11, 2009, were further confirmation that the maroon Taurus station wagon was still parked in the garage attached to 222 West Danner Street, Apartment #3, West Memphis.

Further confirmation of the accuracy and reliability of SOI #2's information about Selvy's telling SOI #2 that hidden compartments would cost approximately $6,500.00 for installation was provided by Agent Harness's being advised by a DEA St. Louis Division expert that the cost to install hidden compartments similar to the hidden compartments found in the Pathfinder which Vincent Davis was driving in the company of Tracy Lee Selvy, would cost approximately $4,000.00 per compartment. Agent Harness provided the opinion that $6,500.00 for the installation of an elaborate hidden compartment in a 2000 Ford Taurus station wagon would be a reasonable fee, again supporting the reliability and accuracy of the statement by SOI #2 that Selvy had put the cost at $6,500.00 for installation of hidden compartments in vehicles.

The foregoing information directly links the defendant, Willie Dwayne Hinton, with the drug trafficking of Tracy Lee Selvy, provides reliable information that Selvy told SOI #1 to be careful driving because the vehicle (the maroon Taurus) contained illegal drugs in a hidden compartment. All the information about the drivers for Tracy Lee Selvy and the hidden compartments in various vehicles, as well as the stop of Vincent Davis and Tracy Lee Selvy by the Missouri Highway Patrol on December 12, 2008, and the discovery of the kilogram of cocaine and ten pounds of marijuana, fit together. This part of the report and recommendation is too long and too involved and too

detailed but shows probable cause that the maroon Taurus station wagon in the defendant's, Willie Dwayne Hinton's, garage contained a hidden compartment which had been used to carry illegal drugs between Arkansas and Cape Girardeau, Missouri, on numerous occasions.

The defendant maintains that while the affidavit sets out a list of allegations, the affidavit is devoid of facts that set out whether illegal substances will be found at the garage and Ford Taurus located at 222 West Danner Street, Apartment #3, West Memphis, Arkansas. (Document #27, Motion to Suppress Evidence and Statements, ¶ 3). The defendant's motion continues, "Although the affidavit sets out a host of details concerning illegal activity, there is simply [nothing] contained in such affidavit to indicate that illegal substances are to be found at the above-mentioned location on March 13, 2009." Id. Defendant's argument seems to be that the affidavit does not show that there are drugs present in the garage or in the Taurus station wagon. The court believes the defendant is construing the search warrant too narrowly.

If one looks at Government Exhibit #1, the Application and Affidavit for Search Warrant alleges that at the property (garage and Ford Taurus located at 222 West Danner Street, #3, West Memphis, Arkansas) is "Evidence of the commission of a criminal offense and property which is designed or intended for use as the means of committing a criminal offense and the fruits and instrumentalities of the crime in violation of Title 21, United States Code, § 841(a)(1)" (the statute forbidding the manufacture, distribution, dispensing, or possession with intent to manufacture, distribute or dispense a controlled substance). The application refers to Exhibit B which includes the 2000 Ford Taurus station wagon, hidden compartments within the 2000 Ford Taurus station wagon, heroin, cocaine, marijuana and other items. The search warrant itself directs the seizure of "evidence of the commission of a criminal offense and property which is designed or intended for use as the

means for committing a criminal offense, and the fruits and instrumentalities of the criminal offense under Title 21, United States Code, § 841(a)(1).

Both the application and the search warrant itself are not limited to the search for and seizure of controlled substances but include property designed or intended for use as the means for committing a criminal offense (specified as drug crimes) and instrumentalities of the criminal offense. Both the 2000 Ford Taurus and the hidden compartments within the 2000 Ford Taurus are evidence of the commission of a criminal offense and property which is designed or intended for use as the means for committing a criminal offense and instrumentalities of the criminal offense under Title 21, United States Code, § 841(a)(1).

The court finds that the foregoing facts provided United States Magistrate Judge H. David Young of the Eastern District of Arkansas with "a fair probability that contraband or evidence of crime [would] be found in a particular place." Gates, 462 U.S. at 238, 103 S.Ct. at 2332.

The court finds there was probable cause for the issuance of the search warrant on the property, namely, garage and Ford Taurus located at 222 West Danner Street, Apartment #3, West Memphis, Arkansas, and hidden compartments within the 2000 Ford Taurus station wagon.

In his second point listed in the defendant's supplemental memorandum and reply memorandum, the defendant states:

II.     Defendant Never Voluntarily Gave His Consent to Search His Residence In
        That Defendant Was In Custody And Was Not Given His Miranda Warnings.

This point of the defendant is made up of two key concepts, the voluntariness of the defendant's consent to search his residence and whether the defendant was in custody when he gave that consent.

If a defendant is in custody and is being interrogated, he must be given the warnings required by <u>Miranda</u> before any statements given by the suspect are admissible in evidence. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444. However, <u>Miranda</u> warnings must be given only when a suspect is both in custody and about to be subjected to government interrogation. <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990). Thus, the admissibility of any statements made by the defendant in response to questioning would have required prior <u>Miranda</u> warnings if the defendant was in custody. Of course, <u>Miranda</u> warnings are not required for the validity of a consent to search, though their administration could be a factor to be reviewed by a court in considering whether the consent was actually voluntary.

## Custody

The Eighth Circuit Court of Appeals in <u>United States v. Martin</u>, 369 F.3d 1046, 1057 (8th Cir. 2004), lists six non-exhaustive indicia to be considered by a trial court in determining whether a subject is in custody:

> (1) whether the suspect was informed that he or she was free to leave or was not under arrest, (2) whether the suspect had unrestrained freedom of movement during questioning, (3) whether the suspect initiated the contact with authorities or voluntarily acquiesced to official requests to respond to questions, (4) whether the police used strong-arm tactics or deceptive strategies during questioning, (5) whether the atmosphere of the questioning was police-dominated, and (6) whether the suspect was arrested at the end of the questioning.

With respect to whether Willie D. Hinton was told that he was free to leave or was not under arrest, Agent Gard testified that he informed Mr. Hinton that he was not under arrest. Agent Gard did not inform Mr. Hinton that he was free to leave the residence. (Tr. 16).

With respect to whether the suspect had unrestrained freedom of movement during questioning, Mr. Hinton's freedom of movement was not completely unrestrained during the search and questioning. An officer remained with Mr. Hinton at all times. He was allowed to go to his

bedroom to put on some pants and shoes, but an officer accompanied him. He was allowed to go to

the bathroom, again an officer accompanied him, usually it was Agent Gard. Agent Gard explained

the reason why. Gard was asked on direct examination whether at any point he directed Mr. Hinton

as to where he should be within the residence while the search was ongoing. Agent Gard responded:

> A. Yes. As the search was ongoing we were finding different handguns and
> different items of evidence, and then he was restricted out of an area, it was in the
> kitchen area, and he was sitting on a chair in the living room. He didn't attempt to
> get up to go in there, but that would have been an area we would have restricted him
> to go. But if there was a point which he wanted to go to the bathroom, he was able
> to go to the bathroom. When we first got there, he was only in boxers and a T-shirt.
> We let him go ahead and put on some clothes. If he needed to go into a room, he was
> allowed to do so.

(Tr. 16-17). The officers observed a weapon when they first came into the defendant's residence, and

they restricted Hinton's movement because of his possible access to weapons during the search. Later

on Gard was questioned about accompanying Mr. Hinton to his bedroom so he could put on his pants.

Agent Gard testified, "That's an officer safety thing. I'm not going to let him go into his room where

he's got a gun." (Tr. 37). (In fact, a loaded .38 handgun was found underneath the mattress in the

master bedroom. (Tr. 44).) It was not only for officer safety that the defendant was monitored, but

also it was to prevent the defendant from coming into contact with evidence which he could destroy.

(Tr. 16-17).

The monitoring of Mr. Hinton during the search of his home was entirely appropriate and

according to law. In United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998), with reference to

an automobile stop, the Eighth Circuit stated, "During an investigative stop, officers may check for

weapons and may take any additional steps 'reasonably necessary to protect their personal safety and

to maintain the status quo during the course of the stop.' United States v. Hensley, 469 U.S. 221,

235, 105 S.Ct. 675, 683-84 (1985)." The same thing is true when a search warrant is being served. A detention may be justified in order to preserve the status quo because a search warrant implicitly carries with it the limited authority to detain the occupants of the premises while the search is conducted. Michigan v. Summers, 452 U.S. 692, 705 (1981); see also Walker v. Bonenberger, 438 F.3d 884, 889 (8th Cir. 2006), where it was reasonable to detain a resident of an apartment that officers mistakenly believed was an apartment to be searched pursuant to a warrant until officers realized the mistake. The fact that for officer safety and for preservation of evidence from destruction, a suspect's movements are controlled does not mean that the suspect is in custody.

With regard to the third factor cited by Martin, although Mr. Hinton did not initiate the contact with authorities, he did voluntarily acquiesce to official requests to the search and to respond to questions about his consent and the general information about why the officers were there. (Tr. 17). It was only after evidence of drug trafficking was found and the defendant was given the Miranda warnings that he invoked his right to remain silent.

With respect to factor 4 in the Martin case, Agent Gard testified that no strong-arm tactics or deceptive stratagems were employed when Gard asked for consent to search. Id.

With respect to item 5 from the Martin case, Gard testified that he believed the atmosphere of his request for consent was not police-dominated. Id. The defendant points to the fact that there were a number of police cars which pulled up to the defendant's residence and there were up to nine officers involved in the search. Even the approach to the defendant's residence was low-key. (Tr. 52). Agent Gard testified that the officers did not have a search warrant for the house so they could have been refused entrance to the home and could have been refused when they requested to search the home. Id. Agent Gard testified that the defendant was not alarmed or scared by the presence of Agent

Gard and other officers who were there because he knew who Gard was when he answered the door. Id. Gard had spoken with Mr. Hinton previously when Hinton had come to Cape Girardeau to testify before the Grand Jury. Detective Bailey Phillips of the West Memphis, Arkansas, Police Department confirmed that Mr. Hinton was not threatened by any officers or physically intimidated or punished prior to Agent Gard requesting that he consent to the search of his home. (Tr. 67). No promises or misrepresentations were given to the defendant to get him to consent to the search. Detective Phillips did believe that Mr. Hinton was in custody when he gave his consent. (Tr. 68).

With respect to where the officers were, Gard testified that the Missouri State Highway Patrolman stayed with the car at the garage. (Tr. 53). He testified that officers were spread out between the kitchen, the master bedroom and the family room the entire time. One officer went out to the front and stayed out in the front for security so that nobody would walk up on the house. As soon as Agent Spain had completed the security sweep of the home, he went out to the garage to join the Highway Patrolman Corporal McDaniel. (Tr. 53). Gard stated the trafficking of officers within the residence was minimal where Mr. Hinton was positioned. Id.

The consent search was conducted by Officer Seger of the SEMO Drug Task Force, Special Agent Harness of the Eastern District of Arkansas DEA, Detective Dennis and perhaps another agent of the DEA. (Tr. 40). Agent Gard testified that he was overseeing Hinton and no one else was overseeing him during the consent search which lasted about an hour and a half. (Tr. 41, 84).

With respect to the sixth factor considered by the court in United States v. Martin, whether the suspect was arrested at the end of the questioning, the defendant was arrested after the items indicating trafficking were found. He was not arrested before the consent to search was given and the written form signed. Gard testified that after the paraphernalia was found and the guns and the scale

with residue, Gard asked the defendant if he wanted to answer questions regarding the items that were found, but before Gard asked Hinton questions, Gard told Hinton he was going to advise him of his <u>Miranda</u> rights. Gard administered the rights and asked Hinton if he wished to answer questions regarding the items that had been found. It was then that Hinton stated he wanted to remain silent. (Tr. 41-42). After his invocation of his right to remain silent, Mr. Hinton made no statements about the car or about anything that was found in the house, but Gard testified he was still friendly. Gard testified that he and Hinton sat around Mr. Hinton's living room and talked "just about this and that." (Tr. 42). Gard was then informed that the tow truck for the maroon Taurus had come and he left. Mr. Hinton was arrested by Bailey Phillips, Narcotics Detective for the City of West Memphis, Arkansas. (Tr. 72).

Based on the factors proposed in <u>United States v. Martin</u> cited above and the totality of the circumstances surrounding the consent, the court finds that the defendant was not in custody when he gave his consent to the search of his home.

Apart from the factors proposed by the <u>Martin</u> case, a person is "in custody" when he is formally arrested or restrained in a manner such as the restraint of an arrested person. <u>United States v. Goudreau</u>, 854 F.2d 1097, 1098 (8th Cir. 1988), citing <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983). There follows the question whether Mr. Hinton believed he was in custody. Mr. Hinton provided an answer when he was finally arrested by Detective Bailey Phillips of the West Memphis Police Department. When the tow truck came and Agent Gard left to go with the seized maroon Taurus, Detective Phillips told Mr. Hinton he was under arrest. Hinton asked "Under arrest for what? I haven't done anything." Phillips explained to him he was being arrested for the drug paraphernalia that was inside the house. Phillips explained to Mr. Hinton about the residue being on the scales and

in the vacuum bag. (Tr. 72). The defendant, from his surprise about being arrested when he was finally placed in custody, conveyed the fact that up to that time he did not believe he was under arrest or had done anything to merit being arrested.

The court finds, again, that the defendant was not in custody when he gave his consent to the search of his home.

## Voluntariness of Consent

The defendant, in his memoranda at II, stated that the defendant never voluntarily gave his consent to search his residence in that the defendant was in custody and was not given <u>Miranda</u> warnings. The court has found that the defendant was not in custody and there was no need to give him <u>Miranda</u> warnings. Though perhaps not necessary, the court will consider specifically whether the consent was voluntary.

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion of duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. <u>United v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990). Voluntariness is a fact question to be determined from the totality of the circumstances present. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-227, 93 S.Ct. 2041 (1973).

The factors personal to the defendant to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had

- 26 -

experienced prior arrests so that he was aware of the protections the
legal system affords to suspected criminals.

Chaidez, 906 F.2d at 381.

Among the factors to be considered in examining the environment surrounding the
consent, courts examine: the length of time a person is detained and questioned;
whether the person was threatened, physically intimidated, or punished by the police;
whether the defendant relied upon promises or misrepresentations made by the police;
whether the defendant was in custody; whether the consent occurred in a public or
secluded location; and stood silently by while the search occurred.

Id.

With respect to personal characteristics proposed by Chaidez:

(1) The defendant was thirty-eight years old when he was arrested, certainly a mature age.

(2) The defendant had graduated from high school according to the Pretrial Services Report.

(3) The defendant was not under the influence or drugs or alcohol according to the evidence.

(4) The defendant was not informed of his Miranda rights prior to his consent to the search;

however, what was more important as far as the defendant's constitutional rights with respect to a

search, the defendant read and had read to him the consent to search form in which he acknowledges

that he had been informed of his "Constitutional Right not to have a search made of the premises

hereinafter mentioned without a search warrant and of my right to refuse to consent to such a

search...." He then gave the officers consent to conduct a complete search of the premises of his

apartment. The consent form concludes, "This written permission is given by me to the above-named

officers voluntarily and without threats or promises of any kind." (Government's Exhibit #3, Consent

to Search). There followed Mr. Hinton's signature.

(5) The defendant had not experienced prior arrests so that he may not have been aware of the

protections the legal system affords to suspected criminals.

Considering the environment surrounding the consent in light of the Chaidez factors, the officers were in the defendant's house for approximately four minutes before they asked permission to search the residence. (Tr. 13). "Just enough time to talk to him about why we were there, explain, ask him about the vehicle, and then ask him for consent." Id. All the evidence is that the defendant was not threatened, physically intimidated, or punished by the police. The defendant did not rely upon promises or misrepresentations made by the police. The defendant was not in custody. The consent occurred in a secluded location in the defendant's home, in a dining area. The defendant did not object to the search but personally consented to the search and acquiesced in the continued searching.

The court finds the consent by the defendant to the search of his apartment was voluntary and the consent was not withdrawn at any time. In fact, Agent Darrell Spain was left with instructions by Agent Gard that he stay to make sure that if consent to search was withdrawn, the officers would stop the search. (Tr. 43, 95).

The court finds that based on the factors proposed by United States v. Chaidez and the totality of the circumstances surrounding the consent, that Defendant Willie D. Hinton's consent to search his apartment was voluntary.

Underlining the fact that the defendant's will was not overborne by his encounter with the agents and the police is the fact that after contraband was found and the defendant was asked if he would discuss the illegal items which were found in the search and after he was given the Miranda warnings, he chose to remain silent. Previously, when he signed the consent to search form, he was advised of his constitutional right not to have a search made of the premises without a search warrant and of his right to refuse to consent to a search, he proceeded to consent to the search.

In summary, the court finds that there was probable cause for the issuance of the search

warrant by United States Magistrate Judge H. David Young on March 12, 2009, of the garage and Ford Taurus located at 222 West Danner, #3, West Memphis, Arkansas. The court further finds that the defendant was not in custody when he gave his consent to search his home and when he talked about the Ford Taurus; and, thus, <u>Miranda</u> warnings were not required either for the search or for defendant's statements concerning the car and any other statements up until the time when he chose to remain silent. Finally, the court finds that the defendant's consent to search his apartment was knowing, voluntary and given with understanding of his constitutional right not to have his apartment searched without a search warrant.

**IT IS, THEREFORE, RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Document #27) be denied.


The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of August, 2009.